Opinion filed October 21,
2010

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                         No. 11-09-00035-CR

                                                    __________

 

                          LOWESTA T. HALLIBURTON, Appellant

                                                             V.

                                      STATE OF TEXAS, Appellee

 



 

                            On
Appeal from the Criminal District Court No. 4

 

                                                          Tarrant
County, Texas

 

                                                  Trial
Court Cause No. 1074680D



                                            M
E M O R A N D U M   O P I N I O N

            The
jury convicted Lowesta T. Halliburton of injury to an elderly individual by
omission – serious bodily injury and assessed her punishment at confinement for
life.  We affirm.

I.  Background
Facts

            Investigator
Ed Wright, with the North Richland Hills Police Department, was investigating
an unrelated matter when he met with Richard Hoye in January 2007.  Hoye was lying
in bed and was covered with a dirty sheet.  Hoye’s bedroom had a foul stench,
and Wright could smell urine.  Hoye appeared bedridden and in need of additional
care.  After their meeting, Investigator Wright contacted Adult Protective
Services.

            Adult
Protective Services Specialist Chandra Wagner was asked to investigate.  She
went to Hoye’s house in January.  She did not notice any odors but thought that
Hoye was disturbingly thin.  Hoye said his caregiver, Halliburton, was taking
good care of him.  Hoye said that Halliburton took him to the doctor, did his
grocery shopping, and was responsible for him.  Hoye told Wagner that he did
not have all of his medications but that he took the ones that he did have.

            Wagner
was concerned because of Hoye’s appearance and was fearful that Hoye was not
telling the truth because he did not want to get anyone into trouble.  Wagner
returned to Hoye’s house with her supervisor in February.  Halliburton was
present.  Halliburton said that she was Hoye’s care provider, that she did not
have a job because she had stopped working to take care of Hoye, and that they
had lived together for twenty years.  Wagner and her supervisor then spoke with
Hoye.  He told them that everything was fine.

            Wagner
was still concerned and she made a referral to CCAD, Community Care for the
Aging and Disabled, so that a more thorough investigation could be performed
and Hoye could receive any necessary services.  Unfortunately, that referral
“fell through the cracks.”  Wagner visited Hoye again in March and April.  He
continued to insist that everything was fine.

            On
May 21, 2007, at approximately 8:00 a.m., North Richland Hills paramedics were
dispatched to Hoye’s house.  Hoye was found dead in his bedroom.  He was
extremely emaciated, was covered by a soiled blanket, and was wearing soiled
underpants.  Small insects and spiders were crawling around his mouth, eyes,
ears, and nose.  Hoye appeared to have a dried feces stain beneath him and a
blood stain next to him.  There were feces around his buttocks.

            Halliburton
identified herself as Hoye’s spouse.  She said that she had spoken with Hoye at
6:00 a.m.  When she next checked on him, he had passed away.  Halliburton later
told a police officer that her daughter checked on Hoye at 6:00 a.m. and that
she returned home at 7:25 a.m. and found that he had died.

            Dr.
Marc Krouse, Deputy Chief Medical Examiner for Tarrant County, performed an
autopsy on Hoye.  Hoye’s body weight, clothed, was only sixty-nine pounds.  Dr.
Krouse determined that Hoye suffered from severe malnutrition and dehydration
and that his starvation was caused by a deprivation of all calories.  Dr. Krouse
determined that Hoye was unable to take care of himself and that he was
deprived of food and water by others and ruled the manner of death as a homicide.

II. 
Issues

            Halliburton
challenges her conviction with two issues.  Halliburton contends that the
evidence is legally and factually insufficient to support her conviction and
that her sentence is disproportionate to the crime.

III. 
Discussion

            A. 
Is the Evidence Sufficient? 

            The State alleged that
Halliburton intentionally or knowingly caused serious bodily injury to Hoye by
failing to feed him or give him sufficient water, by failing to obtain medical
care, and by failing to make arrangements with a facility where he could obtain
appropriate care.  Injury to an elderly individual is a result-of-conduct
offense.  Kelly v. State, 748 S.W.2d 236, 239 (Tex. Crim. App. 1988). 
Thus, the State had to not only prove that Halliburton failed to act as alleged
but that she intentionally or knowingly caused the injury.  Id.  Halliburton
argues that the State failed to carry its burden of proof because Hoye had
several medical problems such as a heart attack, COPD, and low weight, for
which she cannot be blamed; because Adult Protective Services did not intervene
on his behalf after multiple visits to his home; and because Hoye himself did
not ask anyone for assistance.

                        1.  Standard of
Review.  

            Halliburton challenges the legal
and factual sufficiency of the evidence.  The Texas Court of Criminal Appeals,
however, recently held that legal sufficiency is the only standard that a
reviewing court should apply.  Brooks v. State, No. PD-0210-09, 2010 WL
3894613, at *1 (Tex. Crim. App. Oct. 6, 2010).  To determine if the evidence is
legally sufficient, we must review all of the evidence in the light most
favorable to the verdict and determine whether any rational trier of fact could
have found the essential elements of the crime beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307 (1979).  

                        2.  Failing to
Feed.

            Halliburton claimed that Hoye
ate three times a day and that she fed him oatmeal, soup, and cupcakes.  This
was contradicted by the medical evidence.  Dr. Krouse testified that Hoye
weighed only sixty-nine pounds.  He was emaciated and had virtually no
remaining muscle mass in any extremity because his body had started
cannibalizing itself.  Hoye’s body had even started cannibalizing his internal
organs.  His liver was only half its expected weight.  Dr. Krouse could find no
reason for the wasting except starvation and concluded that Hoye’s diet had
been severely restricted for weeks or months.  The State introduced several
pictures of Hoye’s body. These pictures are reminiscent of a World War II
concentration camp. 

            Not only was Halliburton’s
testimony at odds with the medical evidence, it was also refuted by an
eyewitness.  Brandon Westmoreland stayed at Hoye’s home twice in 2006, and he
lived there for three to four months in 2007.  He testified that there was no
cooking done in the house.  There were some frozen or take-out pizza, but no
other food in the house.  Everyone went to fast-food restaurants.  Westmoreland
testified that Hoye was not fed three times a day. He saw food taken to Hoye a
total of four times.  Westmoreland was in jail at the time of trial for theft
of property and failure to identify.  Westmoreland’s criminal issues provide
reason to doubt his veracity, but the jury was entitled to believe his
testimony.  See Adelman v. State, 828 S.W.2d 418, 421 (Tex. Crim. App.
1992) (the jury is the sole judge of the credibility of the witnesses and the
weight to be given their testimony).  

            The medical evidence was
unrefuted that Hoye starved to death because he was not properly fed.  Hoye
would have been bedridden for weeks or months and was, therefore, totally
dependent upon Halliburton.  Because he starved while in her care and because
there was no evidence that she tried to regularly feed him, the evidence is
sufficient to support the jury’s determination that she intentionally or
knowingly injured him.

                        3.  Failing to
Provide Water.

            Dr. Krouse testified that Hoye
was dehydrated.  There was no water in Hoye’s room.  And there was no evidence
that Halliburton or anyone else made any arrangements to provide Hoye with
water.  Because of his condition, Hoye was completely dependent upon
Halliburton for water.  The evidence is sufficient to support the jury’s
determination that Halliburton intentionally or knowingly injured Hoye by not
providing him with water.

                        4.  Failing to
Provide Medical Care.

            Dr. Geoffrey Barst, a family
physician in North Richland Hills, was Hoye’s physician. Dr. Barst first saw
Hoye in 1998.  At that time, Hoye was sixty-nine years old, was 6’1” tall, and
weighed 130 pounds.  When Dr. Barst saw him in 2003, he weighed only 108
pounds.  Dr. Barst was concerned about his weight loss, and he recommended
Ensure.  Hoye told him that he was not being looked after very well because Halliburton
had an outside job.

            Hoye had other health problems
besides low body weight.  He smoked a pack a day, and he developed COPD.  He
had a heart attack in 2002, and he was admitted to Harris Methodist Hospital
where he had a cardiac catheterization and a stent.  Hoye was, therefore, in
need of regular medical attention.

            It was clear that Hoye did not
like doctors.  His first visit to Dr. Barst in 1998 was his first physical in
forty years.  When he had his heart attack, he waited several days after
experiencing chest discomfort before going to the hospital.  Halliburton told
the police that Hoye refused to go to the hospital and that he did not want to
go to the doctor.  Hoye’s last visit to Dr. Barst was in 2004.  This was
apparently his last visit to any doctor.  Halliburton told the police that Hoye
had not seen a doctor in the last two or three years.  Investigator Michael
Floyd with the Tarrant County Medical Examiner’s Office testified that Dr.
Barst told him that Hoye stopped coming because his insurance lapsed.  Dr.
Barst disputed that.  Even if we assume that Dr. Barst was incorrect, Hoye
still had Medicaid or Medicare, and he could have gone to John Peter Smith
Hospital without charge.  Even if Hoye did not like doctors, he was in need of
regular medical attention.  There is no evidence that Halliburton did anything
to meet that need.

            It was also clear that Hoye was
not receiving all of his prescribed medication.  In 2004, Hoye told Dr. Barst
that he had run out of his inhaler and had borrowed someone else’s.  Dr. Barst
prescribed an inhaler and oxygen therapy.  When Wagner and her supervisor saw
Hoye in February, Halliburton did not say anything about Hoye not having all of
his prescribed medications.  When the paramedics found Hoye’s body, there were
oxygen cylinders in his room but no cannula, and there were no regulators on
any cylinder.  Thus, Hoye was not receiving any oxygen therapy.  Police found
two inhalers and a small bottle of nitroglycerine in Hoye’s room.  Each of these
had expired years previously.

            The lack of care and attention
Hoye received from Halliburton was also well chronicled by eyewitnesses.  In
2007, Halliburton was living at her boyfriend’s house.  She would stop by in
the morning when she dropped her youngest son off for school and sometimes came
by on the weekends.  In her absence, Hoye was attended by Halliburton’s oldest
two children who apparently only went in Hoye’s room when he rang a bell.  Halliburton
claimed that she brought Hoye out of his room for a couple of hours a day in a
wheelchair.  However, the police saw no wheelchair in the house.  To them, it
appeared as though Hoye had not been out of his bed in some time.  His body was
soiled and was caked with dead skin and feces.  He had redness and irritation
on every pressure point and had apparently been laying in the same spot for a
long time.  Westmoreland testified that the door to Hoye’s room was never open
and that he never saw a wheelchair in the house.  Whether because Halliburton
did not know or did not timely report is unclear, but Hoye had been dead more
than twelve to fourteen hours when he was discovered by paramedics.

            The jury had sufficient evidence
from which to conclude that Halliburton intentionally or knowingly failed to
obtain medical care for Hoye or to make arrangements with a facility where he
could obtain appropriate care.  Because the jury had sufficient evidence with
which to conclude that Halliburton failed to feed Hoye, failed to provide him
with water, and failed to provide him with medical care or a facility that
could meet his needs, the evidence is legally sufficient to support
Halliburton’s conviction, and Issue One is overruled.

            B.  Was Halliburton’s
Punishment Disproportionate to Her Crime? 

            Halliburton
acknowledges that punishment assessed within a statutory limit is generally not
excessive, cruel, or unusual punishment and that her punishment was within the
statutory limit.  Kirk v. State, 949 S.W.2d 769, 772 (Tex. App.—Dallas
1997, pet. ref’d).  She argues, however, that her sentence violates the Eighth
Amendment because it is grossly disproportionate to the offense.[1] 
Texas courts have found that a prohibition against grossly disproportionate
sentences survives under the federal constitution apart from any consideration of
whether the punishment assessed is within the statute’s range.  Delacruz v.
State, 167 S.W.3d 904, 906 (Tex. App.—Texarkana 2005, no pet.).  

            Texas
courts have followed the Fifth Circuit’s analysis for addressing Eighth Amendment
proportionality complaints.  McGruder v. Puckett, 954 F.2d 313 (5th Cir.
1992).  This requires that we first conduct a threshold comparison of the
gravity of the offense underlying the current conviction as well as the
offenses underlying any prior convictions against the severity of the
sentence.  Id. at 316.  The test is whether the sentence is grossly
disproportionate to the gravity of the offenses upon which the sentences are
based.  Winchester v. State, 246 S.W.3d 386, 390 (Tex. App.—Amarillo
2008, pet. ref’d).  We consider the gravity of the offense in light of the harm
caused or threatened to the victim or society and the culpability of the
offender.  Solem v. Helm, 463 U.S. 277, 291-92 (1983).

            Halliburton
was previously convicted of burglary of a habitation, securing the execution of
a document by deception, attempting to pass a forged writing, and forgery-possession. 
She also had pending charges for burglary of a habitation, credit card abuse,
and theft.  Halliburton correctly notes that these were only property crimes,
but they evidence a pattern of criminal activity – a pattern that continued
after Hoye’s death.

            Police
found two life insurance policies on Hoye at Halliburton’s boyfriend’s house.  The
policies were for $10,000, and they named Hoye’s ex-wife as beneficiary.  Halliburton
described them as burial policies.  She said Hoye’s ex-wife was deceased.  In
fact, Hoye’s ex-wife was very much alive.  Halliburton’s intent was for the
life insurance proceeds to go to the funeral home and then for any remainder to
be sent to her.  The trial court could reasonably conclude that Halliburton
intended to convert Hoye’s life insurance policies.  The State also introduced
a document that purported to deed Hoye’s house to Halliburton.  This document
was in the possession of a longtime friend of Halliburton’s, and it was
witnessed by Halliburton and her oldest son.  Not only were the circumstances
surrounding the document questionable, but Halliburton’s friend testified that
he last saw Hoye in late April and that Hoye walked to the front door, opened
it, and then walked back to his room and put his oxygen back on.  The medical
evidence indicates that Hoye was not being moved and that he was incapable of
walking to the front door.  He did not have the equipment to use his oxygen. 
The trial court could, therefore, reasonably conclude that Halliburton was also
attempting to convert Hoye’s house. 

            Hoye
was allowed to starve to death in his own home because Halliburton was
unwilling to provide him with basic staples such as food and water, to take him
to the doctor, or to make arrangements with a facility that could provide for
his needs.  After he became bedridden, he was so abandoned by Halliburton that
he developed bed sores on every pressure point, and he was allowed to lie in
his own feces covered by a soiled blanket.  After his death, Halliburton was
apparently attempting to take advantage of his passing.  Halliburton’s sentence
is not grossly disproportionate considering the gravity of her offense and her
prior criminal history.  Issue Two is overruled.




 

IV. 
Conclusion

The
judgment of the trial court is affirmed.  

 

            

RICK STRANGE

                                                                                    JUSTICE

 

October 21, 2010

Do not publish. 
See Tex. R. App. P. 47.2(b).

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.









                [1]The Eighth Amendment provides:  “Excessive bail shall
not be required, nor excessive fines imposed, nor cruel and unusual punishments
inflicted.”  U.S. Const. amend.
VIII.